# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.

CONNOR CARBALLIDO,

    Plaintiff,

v.

TARGET CORPORATION,

    Defendant.

## PLAINTIFF'S COMPLAINT FOR DAMAGES AND JURY DEMAND

Plaintiff, Connor Carballido, by and through his attorneys, Leventhal & Puga, P.C. and Bryan Pope, Pope Taylor Law, for his Complaint for Damages and Jury Demand, states as follows:

### Parties, Jurisdiction, and Venue

1. This is a diversity action filed under the provisions of 28 U.S.C. § 1332(a)(1) by reason of the complete diversity of citizenship between the Plaintiff and the Defendant. Further, the amount in controversy exceeds $75,000.00.

2. Long arm jurisdiction exists pursuant to Colo. Rev. Stat. § 13-1-124(1)(b) because the tortious acts that gave rise to Plaintiff's claims occurred in the State of Colorado.

3. Personal Jurisdiction exists because Defendant has purposefully availed itself of the privilege of conducting business in Colorado. Defendant purposefully directs its activities at Colorado residents. This case arises out of Defendant's acts and/or omissions at one of its stores.

4. Venue is proper in this Court under 28 U.S.C. § 1391.

5. Plaintiff Connor Carballido is a citizen and resident of the State of Colorado.

6. Defendant Target Corporation ("Target") is organized and existing under the laws of the State of Minnesota, having its principal place of business at 1000 Nicollet Mall, Minneapolis, MN 55403.

7. Target owns and operates over 40 stores throughout the state of Colorado.

8. Target also owns and operates a distribution center located at 34800 E United Ave, Pueblo, CO 81001 where Target merchandise is stored and shipped all over the State of Colorado.

**General Allegations**

9. On December 20, 2017, Connor Carballido went to the Target store located at 15700 East Briarwood Circle, Aurora, Colorado.

10. Connor was at Target to purchase Christmas gifts for his family.

11. Target, either expressly or implicitly, made representations that the public is requested or intended to enter its property. Connor entered the property in response to these representations.

12. Because Connor was at the Target to transact business in which the parties were mutually interested and/or because Target intended the public to enter its property, Connor was an invitee. Target, therefore, had duty to exercise reasonable care to protect Connor against dangers of which it actually knew or should have known.

13. On December 20, 2017, Defendant left an empty pallet near the end of one of the aisles of the store.

14. Target knew or should have known that this obstruction was a danger to the public and its patrons.

15. While in the electronics department, Connor walked into the aisle where the pallet was left unattended, with no markings or caution signs around it, and tripped over it.

16. Target made no effort to alert the public of the obstruction or move it to a safer location.

17. Connor tripped over the pallet, began falling to the ground, before catching himself and, in the process, severely twisted his left knee.

18. Because of the location of the pallet, Connor did not see it and could not have avoided tripping over it.

19. But for Target placing the obstruction in the aisle and failing to warn its patrons, Connor would not have suffered this tripping incident and the resulting injuries.

20. Immediately following his tripping incident, Connor filled out an incident report with Ms. Paline Gluekert, who was acting as the LOD (leader on duty) at the time.

21. In the report Connor states that he came "walking around the corner and didn't see the pallet and tripped." He also noted that the "pallet [was] in the aisle" and it "felt like [he] blew out my knee."

22. The next day Connor drove to work in debilitating pain and by midafternoon was unable to continue. By that time, he couldn't put any weight on that leg and noticed that both his left knee and foot were swollen and discolored.

23. Because of Connor's persistent pain, on December 22, 2017, Connor's father drove him to the Rocky Mountain Urgent Care. There, he got an X-ray of his left knee and was prescribed NORCO, given an injection for pain, as well as crutches and a knee immobilizer.

24. Rocky Mountain Urgent care recommended that Connor see an Orthopedic Specialist for follow-up care. Connor made an appointment to see Dr. Scott G. Resig at Advanced Orthopedic and Sports Medicine Specialists on December 26, 2017.

25. Connor's father drove him to that appointment where Dr. Resig refilled Connor's pain medication and recommended Connor go immediately to the Orthopedic Centers of Colorado for an MRI of his knee.

26. Several days later, Dr. Resig called Connor and explained that the MRI did not show any tears. But because of the continued pain, Dr. Resig scheduled a follow-up appointment.

27. Connor returned to Dr. Resig on January 4, 2018, where Dr. Resig prescribed physical therapy and gave Connor a cortisone knee injection.

28. That day, Dr. Resig first noted that Connor may have Complex Regional Pain Syndrome ("CRPS") due to his lack of improvement and continued pain.

29. On February 5th, 2018, Connor complained of severe pain and attempted to make an emergency appointment with Dr. Resig. Unfortunately, Dr. Resig was out-of-town and so Connor rushed to his family doctor, Dr. John Willard.

30. Dr. Willard prescribed Connor Diclofenac for pain relief and inflammation. Dr. Willard also ordered an ultrasound of Connor's left leg to test for blood clots. Those tests came back negative.

31. On February 6, 2018, Connor again went to see Dr. Resig who x-rayed Connor's ankle and foot. The x-rays showed no fractures. Dr. Resig also prescribed Gabapentin to try and relieve the persistent nerve pain. Dr. Resig then referred Connor to Dr. Christopher J. D'Ambrosia, an Interventional Physiatrist and specialist in pain management.

32. February 7, 2018, Dr. Christopher D'Ambrosia noted that Connor's symptoms were consistent with CRPS and prescribed a blood pressure medication (Clonidine) and scheduled a Lumbar Sympathetic Nerve Block, noting it was Connor's best chance of CRPS remission.

33. Throughout February and March of 2018, Connor received a series of sympathetic nerve block injections, in an attempt to control his unrelenting pain.

34. On February 22, 2018, Connor began Physical Therapy with Advanced Orthopedics several times a week. Connor's therapy was (and is) extremely painful and only alleviates a small amount of his symptoms.

35. On March 27, 2018, on Dr. D'Ambrosia's suggestion, Connor saw Dr. Brent Van Dorsten, a clinical psychologist who specializes in treatment for pain and functional limitations, in hopes that he could address the ongoing pain and resulting psychological damage.

36. At that point, Connor described his global body pain as being a 10/10 in severity. He described his resulting anxiety and depression as a 10/10.

37. Connor's symptoms worsened throughout April 2018, in which he describes severe nausea, uncontrollable shivers, increasing anxiety, and lack of sleep. Connor conveyed these concerns to Dr. D'Ambrosia on April 23, 2018, who then prescribed Ondansetron (a nausea medication) and Cymbalta (a nerve pain, antianxiety, and antidepressant medication), at the recommendation of Dr. Van Dorsten.

38. On May 14, 2018, Connor first saw Dr. Sara Markey, a certified psychiatrist at Actify Neurotherapies, for an initial consultation and first intravenous ketamine infusion, a drug used to treat CRPS, anxiety, and depression.

39. Over the next two weeks, Connor received five more infusions and was able to take his first steps without crutches, though this caused him greater pain and weakness in his leg. Connor ultimately had to continue using crutches to ambulate due to the pain.

40. Dr. D'Ambrosia then referred Connor to Dr. Jeffrey Simon, an anesthesiologist to coordinate with Dr. Markey on further ketamine infusions and a nerve block.

41. Between June 4 and June 7, 2018, Connor was heavily sedated and received two Nerve Block Injections and three ketamine infusions.

42. Connor continued his physical therapies throughout the summer, and on August 6, 7 and 9, 2018, received an additional ketamine infusions from Dr. Markey.

43. In mid-August Connor, still having not received relief from his pain, reached out to CRPS expert and director of the California Pain Medicine Center, Dr. Joshua Prager. After speaking with him several times, Connor made an appointment to be evaluated by Dr. Prager and his team on September 20, 2018.

44. On September 17 2018, Connor purchased an H-Wave home Unit, at the advisement of Dr. D'Ambrosia, to help stop the disuse atrophy developing in his affected leg.

45. On September 20, 2018, Connor was evaluated by Dr. Prager and his team at the California Pain Medicine Center. Dr. Prager confirmed Connor's CRPS diagnosis and approved him for a two week intensive program including ten high-dose ketamine infusion treatments.

46. On September 26, 2018, Dr. Prager recommended Connor start a four week comprehensive and functional rehabilitation pain program to regain mobility in his leg and learn to cope with the pain. During this phase of treatment Connor also received two lumbar sympathetic nerve blocks.

47. On October 9, 2018, Connor was evaluated by Marilyn Jacobs, a clinical pain psychologist, Evvy Shapero, a therapist who conducts neuro-biofeedback and multi-modality biofeedback sessions, and Kern & Associates Physical Therapy. There he was given physical therapy, biofeedback and psychotherapy assignments to practice at home.

48. Due to his pain and immobility, Connor was unable to work full time from the time of the accident until November 26, 2018.

49. In a pain management follow-up report on October 8, 2018, Dr. Prager notes, "Mr. Connor [Carballido] presents to the office today for followup. He has recently completed a series of 10 ketamine infusions and is here today as day 1 of the comprehensive interdisciplinary functional rehabilitation program." Continuing, Dr. Prager notes, "We have explained that he used to previously swim competitively on and would like to go and get back into swimming. He also bought a snowboard just prior to his injury back in December 2017 and was not able to use it. He explains that as a result of this injury and pain, socially he feels as though this past year he has essentially been a 'ghost.'"

50. On October 29, 2018, Dr. Prager notes, "As he nears the end of this program though he does have some apprehension about going home and some concerns about what to do should flares manifest as well as concerns regarding potential spread of his complex regional pain syndrome as this is something he has had fears about for quite a while."

51. On November 2, 2018, Dr. Prager notes the conclusion of Connor's first functional rehabilitation program and states, "[Mr. Carballido] does not feel he is finished. He has moved from using crutches to only using a cane and wished to become more independent. The plan is for him to return for 3 booster ketamine infusions in either late January or early February and then to participate in additional 2 weeks of the functional rehabilitation program."

52. Connor continues to treat with Dr. Prager and his team in California, where he is likely to need future painful and invasive medical procedures including ketamine therapy, spinal nerve blocks, physical therapy, and possibly a spinal cord stimulator.

53. Currently, Connor continues to struggle with day-to-day activities; he must use a cane to get around and is in constant pain, including burning and crushing sensations. As a result of this lost mobility and function, Connor suffers severe mental distress and depression.

54. Prior to his injury, Connor was in line to compete for a promotion at his place of employment. Due to his injury, Connor has not been able to compete for that promotion.

55. Connor is no longer able to enjoy many of his favorite activities, including basketball, bicycling, snowboarding, or even walking his dog.

56. Because of his limited mobility, Connor relies on his family for help with daily chores, transportation, and basic daily tasks.

## First Claim for Relief
### (Negligence)

57. Paragraphs 1-56 are incorporated by reference.

58. Defendant had a duty, at all relevant times, to operate and maintain its store in a reasonable manner.

59. Defendant was negligent in its maintenance of the Target store. This negligence includes, but is not limited to:

   a. Failure to provide a safe and clear aisle way for the public to shop;

   b. Failure to notice and remove dangerous obstructions in the aisle; and

   c. Failure to warn its patrons of the obstruction in the walkway.

60. As a direct and proximate result of Defendant's negligence, Connor Carballido suffered and will continue to suffer injuries, damages, and losses, described more fully herein.

## Second Claim for Relief
### (Premises Liability)

61. Paragraphs 1-60 are incorporated by reference.

62. Connor Carballido was an invitee.

63. Defendant was an entity in possession of real property and legally responsible for the condition of and circumstances existing on the real property.

64. The pallet, obstructed aisle, and lack of warning constituted dangerous conditions and/or circumstances on Defendant's property.

65. Defendant actually knew about a danger on its property or, as an entity using reasonable care, should have known about it.

66. Defendant failed to use reasonable care to protect against the danger on the property.

67. Because of Defendant's failure to use reasonable care, Connor Carballido suffered and will continue to suffer injuries, damages, and losses, described more fully herein.

WHEREFORE, Plaintiff prays that judgment be entered in his favor and against the Defendants in an amount to be determined by the trier of fact, which will fully and fairly compensate Plaintiff for the suffered injuries, damages, and losses, both economic and noneconomic, compensatory and special, both past and future, pre and post-judgment interest as allowed by law, and for such other and further relief as this Court may deem appropriate.

PLAINTIFF DEMANDS A TRIAL BY JURY.

DATED this 10th day of April, 2019.

LEVENTHAL & PUGA, P.C.

s/ Brian N. Aleinikoff
Bruce L. Braley, Atty. No. 48612
Brian N. Aleinikoff, Atty. No. 49238
Leventhal & Puga P.C.
950 South Cherry Street, Suite 600
Denver, CO 80249
Telephone: (303) 759-9945
Facsimile: (303) 759-9692
Email: bbraley@leventhal-law.com
Email: baleinikoff@leventhal-law.com

-and-

Bryan D. Pope, SBN 00788213
3400 Carlisle St., Ste. 550
Dallas, TX 75204
Telephone: (214) 651-4260
Facsimile: (214) 651-4261
Email: bpope@cochranfirm.com

***ATTORNEYS FOR PLAINTIFF***

*Plaintiff's Address:*
6630 South Waco Way
Centennial, CO 80112